### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CONNIE MANLEY, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | **Case No. 17-cv-2699 (APM)** |
| HCA HOLDINGS, INC., *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Defendant Columbia Valley Healthcare System, L.P., which does business as Valley Regional Medical Center ("Valley Regional"), is an acute care hospital located in Brownsville, Texas.  Its parent company is Defendant HCA Healthcare, Inc. ("HCA").[1]  Relators Connie and Daniel Manley allege that Defendants submitted false claims, records, and statements to the Centers for Medicare and Medicaid Services to secure Medicare and Medicaid payments in violation of the False Claims Act ("FCA").  Although the United States declined to intervene, Relators proceeded with this action.

Now before the court is Defendants' Motion to Dismiss the First Amended Complaint and Relators' Motion for Leave to File a Second Amended Complaint.  For the reasons that follow, the court dismisses the First Amended Complaint for failure to state a claim and denies Relators' request to amend as futile.

---

[1] The operative complaint names HCA Holdings, Inc. as a defendant. First Am. Compl., ECF No. 14.  According to Defendants, HCA Holdings has since changed its name to HCA Healthcare, Inc. as of April 2017.  Mot. to Dismiss, ECF No. 63, at 1 n.1.  Plaintiffs sought to correct the name in their proposed Second Amended Complaint.  *See* Mot. for Leave to File 2d Am. Compl., at 3 n.4.  For simplicity, the court simply refers to the entity as HCA.

## II.     BACKGROUND

### A.     Factual Background

Relator Connie Manley was a Level 3 Trauma Manager at Valley Regional between May 2011 and 2015. First Am. Compl., ECF No. 14 ("FAC"), ¶ 12.  Relator Daniel Manley, Connie's spouse, was a patient at Valley Regional in April 2014.  *Id.* ¶ 13.   Through their personal observations and other sources of information, Relators allege that they discovered numerous violations of laws and regulations that protect patient privacy and personal health information ("PHI") and promote the use of electronic health records ("EHR").  Specifically, Relators contend that these violations rendered materially false (1) certain "Meaningful Use Attestations" made to the Centers for Medicare and Medicaid Services and (2) various certifications relating to compliance with conditions of participation in the Medicare and Medicaid programs.  The court discusses each in turn.

#### 1.     *Meaningful Use Attestation Allegations*

Two statutes are relevant to this matter.  The first is the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104–191, 110 Stat. 1936 (Aug. 21, 1996) ("HIPAA"), which limits the circumstances in which patients' confidential medical information can be used or disclosed.  FAC ¶ 45.  The other is the Health Information Technology for Economic and Clinical Health Act, Title XIII, Pub. L. No. 111–5, 123 Stat. 226 (Feb. 17, 2009) ("HITECH"), which provides incentive payments to eligible entities participating in Medicare and Medicaid programs that meet certain criteria for the "meaningful use" of certified EHR technology.  FAC ¶ 50. To receive these incentive payments, a provider must certify that it satisfied certain meaningful use criteria, at least one of which relates to protecting electronically maintained health information consistent with HIPAA and its implementing regulations.  *Id.*  Relators allege that Defendants

knowingly made false attestations concerning compliance with the meaningful use criteria (the "Meaningful Use Attestations"), which allowed them to receive millions of dollars in payments from the U.S. Department of Health and Human Services ("HHS"). *Id*. ¶ 51.

According to Relators, Defendants' Meaningful Use Attestations were false due to multiple shortcomings in their electronic health records security and management. They point to a host of claimed deficiencies, including: (1) inadequate training on patient privacy, *id.* ¶¶ 53, 63; (2) substandard access control and audit logs, *id.* ¶¶ 9, 53, 63; (3) inadequate assessment and "compliance process[es]," *id.* ¶¶ 9, 53, 63; (4) a "lack of regard" for the requirements "to determine a breach of a patient's privacy," *id.* ¶ 53; (5) unsecure physical spaces, *id.* ¶ 63; (6) insufficient policies and procedures regarding patient health information, *id.* ¶ 63; and (7) ineffective employee and contractor background checks, *id.* ¶¶ 53, 63. As to the last of these, Relators allege that Defendants failed to catch that a contractor by the name of Michael Cooney had a criminal history. *Id.* ¶ 53; *see also* ¶¶ 54–56, 63. Relators also point to Defendants' nonsecure use of workstations on wheels, which are mobile computers used to access and input patient information. *Id.* ¶ 53. According to Relators, these computers "did not have privacy screens," lacked software that "automatically placed the workstation in 'sleep mode,'" and would be frequently left unmonitored with patient information exposed. *Id.*

To illustrate these violations, Relators cite examples occurring during Mr. Manley's stay at Valley Regional in the spring of 2014. *Id.* ¶ 57. They also provide a table of various privacy-related regulatory requirements with which Defendants allegedly did not comply. *Id.*, Table 1, at 22–24. For most of these, Relators do not specify how Defendants violated the regulation; for some, Relators offer only a short one- or two-sentence explanation. *Id.*

2.    *Conditions of Participation Allegations*

Valley Regional derives a significant portion of its revenues from claims submitted to the Medicare and Medicaid programs. *Id.* ¶ 8, 65. To participate in these programs, a hospital must comply with various conditions of participation, set forth in federal regulations. *See* 42 C.F.R. § 482 *et seq.* Relators allege that Defendants did not comply with some of these conditions.

To allege such breaches, Relators identify the relevant condition and then point to specific aspects of Mr. Manley's hospitalization to illustrate the violation. Relators allege, for instance, that Mr. Manley's medical records (1) omit certain information about his treatment, in violation of 42 C.F.R. § 482.24 ("Medical Record Services and Documentation Compliance"), FAC ¶¶ 67, 73–74; (2) indicate an "excessive" prescription of fentanyl without any record of unused amounts being "wasted," in violation of 42 C.F.R. § 482.25 ("Pharmaceutical Services Compliance"), *id.* ¶¶ 68, 74; and (3) "reflect a lack of compliance with" 42 C.F.R. § 482.52, which requires hospitals to prepare a post-anesthesia evaluation and report ("Anesthesia Services Compliance"), *id.* ¶ 70. Relators additionally claim that Mrs. Manley "has no knowledge of a utilization review committee ever existing at Valley Regional," in violation of 42 C.F.R. § 482.30 ("Utilization Review Compliance"). *Id.* ¶ 69. Finally, Relators assert "[u]pon information and belief" that "these practices illustrate regular failures of compliance with federal and state requirements by Valley Regional." *Id.* ¶ 75.

**B.    Procedural History**

Relators filed this *qui tam* action under the FCA in December 2017. *See* Compl., ECF No. 1. Nearly a year later, on November 19, 2018, they filed an Amended Complaint. *See* FAC. After investigating Relators' claims, the government announced in April 2023 that it would not intervene. *See* United States' Notice of Election to Decline Intervention, ECF No. 36.

On April 13, 2023, the court unsealed the Amended Complaint and allowed it to be served. Order, ECF No. 37.  Defendants filed a motion to dismiss on November 13, 2023.  Defs.' Mot. to Dismiss Relators' Am. Compl. and Mem. of Law in Supp., ECF No. 63 [hereinafter MTD]. Relators opposed dismissal, Pls.-Relators' Mem. in Opp'n to MTD, ECF No. 69 [hereinafter MTD Opp'n], but also sought leave to amend, Pls.-Relators' Mem. of Law in Supp. of Mot. for Leave to Amend, ECF No. 70-1 [hereinafter MLA], which included a proposed Second Amended Complaint, ECF No. 70-2 [hereinafter SAC].  Defendants opposed that request.  Defs.' Opp'n to MLA, ECF No. 72 [hereinafter MLA Opp'n].

## III.    LEGAL STANDARDS

### A.    Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  The factual allegations in the complaint need not be "detailed"; however, the Federal Rules demand more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).  If the facts alleged fail to establish a claim upon which relief can be granted, a court must grant the defendant's Rule 12(b)(6) motion.  *Id.* (citing *Twombly*, 550 U.S. at 555); *see also Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.,* 922 F. Supp. 2d 56, 61 (D.D.C. 2013).

## B.    Rule 9(b) Standard

Fraud claims, like those asserted here, are subject to the heightened pleading requirement of Rule 9(b). That Rule provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see also United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 123 (D.C. Cir. 2015) (applying Rule 9(b) to claims filed pursuant to the FCA); *United States ex rel. Lott v. Not-For-Profit Hosp. Corp.*, 296 F. Supp. 3d 143, 151 (D.D.C. 2017) ("Substantive FCA claims, like common law fraud claims, must satisfy the heightened pleading standard of Rule 9(b)."). "Motions to dismiss for failure to plead fraud with sufficient particularity are evaluated in light of the overall purposes of Rule 9(b)," *United States ex rel. Tran v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 115 (D.D.C. 2014), which include "ensur[ing] that defendants have notice of the charges against them adequate to prepare a defense," *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 34 (D.D.C. 2003).

"Rule 9(b) is not an antithesis of Rule 8(a)'s 'short and plain statement' requirement, but rather a supplement to it." *Baker v. Gurfein*, 744 F. Supp. 2d 311, 315 (D.D.C. 2010). Although the rule does not require a complaint "to contain a detailed allegation of all facts supporting each and every instance of submission of a false claim," *Barrett*, 251 F. Supp. 2d at 35, a plaintiff "must . . . provide a defendant with notice of the who, what, when, where, and how with respect to the circumstances of the fraud," *Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 114 (D.D.C. 2009) (internal quotation marks and citation omitted); *see also United States ex rel. Bailey v. Veterans Med. Transcription Servs., Inc.*, No. 23-7171, 2024 WL 4864480, at *1 (D.C. Cir. Nov. 22, 2024). That includes a "detailed description of the specific falsehoods that are the basis for his suit." *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002).

IV.    **DISCUSSION**

A.    **Motion to Dismiss[2]**

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id*. § 3729(a)(1)(B).    A "claim . . . includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs."  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 182 (2016) (citing 31 U.S.C. § 3729(b)(2)(A)) (internal quotation marks omitted).

To make out an FCA claim, a relator must plead not only that the defendant submitted a false claim, but also that the defendant knew it was false.  *United States ex rel. Davis v. Dist. of Columbia*, 793 F.3d 120, 124 (D.C. Cir. 2015) (citing *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 218 (D.C. Cir. 2003)).   The alleged falsehood must be material.  *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 98–99 (D.D.C. 2017) (citing *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1269, 1271 (D.C. Cir. 2010)); *see also Escobar*, 579 U.S. at 191–95.   Thus, an FCA claim requires the trifecta of falsity, materiality, and scienter.

1.    *Meaningful Use Attestations*

Defendants argue that Relators' Meaningful Use Attestation claims fall short on each element of the trifecta.   They maintain that (1) "Relators fail to connect any violation to a false claim or payment, much less plausibly plead a fraudulent scheme with the particularity required

---

[2] In Counts IV and V of the FAC, Relators allege conspiracy and reverse FCA claims, respectively.  FAC ¶¶ 93–97. Relators concede that those claims are insufficiently pleaded, MTD Opp'n at 34, so the court will dismiss them.

by Rule 9(b)"; (2) "Relators do not plead sufficiently that any purported false statement was material to the government's decision to pay"; and (3) "the Amended Complaint fails to plausibly allege that Defendants acted with the requisite intent to defraud[.]"  MTD at 11.

As to falsity, Defendants focus on the fact that Relators do not provide "any specifics of a submission" and fail to tie violations to particular "payments to Valley Regional."  MTD at 12–13.  But Relators' pleading troubles go even deeper than that.  Relators fail to explain *how* any Meaningful Use Attestation, and thus any claim for payment, was false.  Take, for example, Relators' allegations about Defendants' use of workstations on wheels.  FAC ¶ 53.  Relators contend that these workstations lacked privacy screens and did not have an automatic "sleep mode," which would darken the screen after a period of nonuse.  *Id.*  They also assert that, due to a lack of training, hospital personnel routinely would walk away from the workstations, leaving patient information vulnerable to prying eyes.  *Id.*  Relators further contend that because Defendants did not "conduct[ ] a risk assessment, these deficiencies were never addressed during Mrs. Manley's employment at Valley Regional."  *Id.*

None of these allegations, even if true, sufficiently plead falsity.  Nowhere do Relators explain how any one or more of these purported shortcomings rendered false a claim made to the government.  Relators cite regulations requiring covered entities to "*reasonably* safeguard protected health information," FAC ¶ 48 (citing 45 CFR § 164.530 (c)(l)(2)(i), (ii)) (emphasis added), but they offer no facts to explain how any of the cited practices fell short of that standard and, if they did, how that led to a false claim.

The same problem plagues other theories of falsity.  Relators describe in detail the alleged criminal background of Michael Cooney that Defendants failed to identify, *id.* ¶¶ 54–56, but the connection between that lack of oversight and a false claim is never explained.  Relators also

describe the occurrence of an apparent HIPAA violation during Mr. Manley's stay at Valley Regional, *id.* ¶ 57, but again fail to specify why that episode rendered any claim false. Finally, there is Relators' chart of violations. *Id.* at 22–24. It is woefully inadequate. It consists of a list of regulations and baldly asserts that Defendants did not comply with them. *Id.*

Internal inconsistencies also doom Relators' pleading. To illustrate, Relators assert that there was a "lack of password and unique user ids," FAC ¶ 63, but later state that "passwords were assigned but were also shared," *id.* at 23, Table 1. As another example, Relators contend that Defendants did not conduct a "risk assessment," *id.* ¶ 53, but later reference "attached exhibits, which are templates disseminated by HHS to utilize during an annual risk assessment," *id*. ¶ 63. No exhibits are attached to the FAC. These pleading deficiencies further muddle an already unclear picture of what statements made by Defendants were false and why they were false.

The complaint falls short on the second element of knowledge, as well. Nowhere do Relators identify *who* would have known of the alleged failings and whether that person had any responsibility for making or submitting Meaningful Use Attestations. *See United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1257 (D.C. Cir. 2004) (affirming dismissal of FCA claims where the complaint "fail[ed] to identify with specificity who precisely was involved in the fraudulent activity").

As to the third element—materiality—the court addresses those pleading deficiencies below.

### 2.    *Conditions of Participation*

Defendants make two arguments as to why the conditions-of-participation claims should be dismissed. First, they assert that Relators failed to identify a false statement or submission.

MTD at 19–22.  Second, they contend that Relators failed to plead any of the particulars—the who, what, where, or when—of the alleged fraudulent activity.  *Id*. at 22–24.

As to this set of FCA claims, Relators "allege an implied false certification theory."  MTD Opp'n at 27.  In *Escobar*, the Supreme Court identified two conditions to support such theory of liability.  579 U.S. at 190.  First, "the claim does not merely request payment, but also makes specific representations about the goods or services provided."  *Id.*  Second, "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths."  *Id*.  Relators do not adequately plead either element.

To support their claim, Relators catalog various instances of noncompliance with conditions of participation that they uncovered in Mr. Manley's medical records.  The list includes violations relating to "Medical Record Services and Documentation Compliance," FAC ¶¶ 67, 73-74; "Pharmaceutical Services Compliance," *id.* ¶¶ 68, 74, "Anesthesia Services Compliance," *id.* ¶ 70; "Utilization Review Compliance," *id.* ¶¶ 69, 72; and the inadequacy of policies and procedures, *id.* ¶ 66.  But nowhere do Relators allege to what "specific representation" these shortcomings relate.  *Escobar*, 579 U.S. at 190.  And without a "specific representation," the court cannot assess how these instances of noncompliance rendered them "misleading half-truths."  *Id*.  Put another way, the complaint lacks sufficient "relevant facts" that would allow the court to infer that Defendants' alleged noncompliance with certain conditions of participation gave rise to implied false claims.  *U.S. ex rel. Bender v. N. Am. Telecommunications Inc.*, 499 F. App'x 44, 45 (D.C. Cir. 2013).

3.    *Materiality*

Relators also fail to sufficiently plead materiality for both of their fraud theories. In *Escobar*, the Court observed that the standard for materiality is "rigorous" and one amenable to resolution on a motion to dismiss.  579 U.S. at 195 n.6.  It explained:

> A misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.

*Id.* at 194.  On the other hand, materiality may be found where there is evidence that the "government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular" statutory or regulatory requirement.  *Id.* at 195.

Relators' pleading of materiality rests on three general fact contentions.  First, they claim that compliance with the HITECH Act is a condition of meaningful use payments.  MTD Opp'n at 31.  Second, they insist that Defendants knew that compliance with relevant healthcare provider policies is material to the Government's decision to make payments.  *Id.*  Finally, they assert that "Defendants' noncompliance is not insignificant nor minor because it is wide-spread and 'goes to the essence of the bargain' for Medicare and Medicaid incentive payments and reimbursements." *Id.* at 32 (citation omitted).  These allegations are inadequate to plausibly establish materiality.

As to the first, *Escobar* made clear that statutory and regulatory requirements "are not automatically material, even if they are labeled conditions of payment." *Escobar*, 579 U.S. at 191. So, it is not enough to assert that the government reserves the right to refuse payment if a Meaningful Use Attestation is false.  Nor is it sufficient to claim a violation of a condition of payment.  That "is relevant, but not automatically dispositive." *Id.* at 194.

Relators attempt to shore up their case for materiality by pointing to two enforcement actions—one criminal, one civil—involving false Meaningful Use Attestations. The criminal matter involved the indictment of a hospital CFO for making a false attestation, where his hospital, during the fiscal year at issue, "relied on paper records . . . and only minimally used electronic health records," and where he directed "hospital employees to manually input data from paper records into the electronic health record (EHR) software, often times months after the patient was discharged and after the end of the fiscal year." U.S. Dep't of Justice, *Former Hospital CFO Charged with Health Care Fraud* (Feb. 6, 2014), https://perma.cc/NE24-U4QU; FAC ¶ 58, n.19. In the civil case, the company reported that "employees falsified data regarding the company's use of EHR software, fabricated software utilization reports, and superimposed EHR vendor logos onto the reports to make them look legitimate." U.S. Dep't of Justice, *21st Century Oncology to Pay $26 Million to Settle False Claims Act Allegations* (Dec. 12, 2017), https://perma.cc/FZV9-BKTS; FAC ¶ 60. To state the obvious, these cases bear no resemblance to this one. Their only similarity is that they all concern representations about the use of EHR. That common feature alone cannot establish materiality. FAC ¶ 60.

To support their assertion that Defendants knew that the false Attestations were material, Relators point to Defendants' 2014 Form 10-K, MTD Opp'n at 31, which states that "[f]ailure to implement and continue to demonstrate meaningful use of certified EHR technology could have a *material*, adverse effect on [HCA's] financial position and results on operations," *id.* (emphasis added). But that statement says nothing about the materiality of the noncompliance that Relators allege. First, the Form 10-K refers to materiality as it relates to the company's financial position, not to the government's acceptance of their claims. Second, the citation does nothing to demonstrate what the *government* would consider material in its payment decisions. Finally, the

10-K says nothing that would indicate that the specific violations that Relators identify are of the kind that the government would consider material.

Finally, as support for materiality, Relators assert that the noncompliance at issue here is neither "insignificant nor minor." MTD Opp'n at 32. But their mere say so is not enough. Relators have not identified a single instance where the government withheld payment because it determined that a Meaningful Use Attestation was false due to the types of noncompliance alleged here. And, as to conditions of participation, even if the deficiencies in Mr. Manley's medical records are accurate, violations as to a single patient cannot be sufficiently significant or major to establish materiality.

### B.    Motion for Leave to File Second Amended Complaint

Having concluded that their operative pleading fails to state FCA claims, the question remains whether the court should allow Relators to amend yet again. The standard for amendment is not strict. Rule 15(a) instructs courts to "freely give leave" to amend, and the Supreme Court has emphasized that Rule 15(a)'s "mandate is to be heeded," *Foman v. Davis*, 371 U.S. 178, 182 (1962). A court nevertheless may deny leave, as Defendants urge here, based on the "futility of amendment." *Id*. An amendment is futile "if the proposed claim would not survive a motion to dismiss." *James Madison Ltd. v. Ludwig,* 82 F.3d 1085, 1099 (D.C. Cir. 1996).

Relators proffer a Second Amended Complaint that, they say, is based on their "continuing investigation." SAC ¶ 66. The SAC purports to substantially narrow the claims asserted and provide additional facts to support those claims. Much of this additional evidence is based on interviews of former HCA employees who "confirmed that the pervasive issues identified by Relators existed and persisted throughout the HCA hospital system nationwide." MLA at 1; *see also* SAC ¶¶ 66–179. The security flaws identified in the Second Amended Complaint largely

mirror those in the First, but include some that are new.  The alleged violative policies and practices include: (1) the failure to limit access to patient records based on the hospital employee's role in providing care, SAC ¶ 42; (2) "dysfunctional and incomplete audit log functionality," *id*. ¶¶ 43–45; (3) the lack of encryption for email communications, *id*. ¶ 47; (4) workstations on wheels that insufficiently protect access to patient records, *id*. ¶ 48; and (5) the failure to perform required "Security Risk Analys[e]s," *id*. ¶¶ 49–51.  The SAC offers testimonials from twelve different witnesses to corroborate these claims.  *Id.* ¶¶ 67–179.

Many of the new witness accounts center on security issues relating to the workstations on wheels.  These workstations, Relators allege, created significant security risks because they did not have automatic sleep modes and because employees routinely failed to log out.  *See e.g.*, SAC ¶¶ 69, 72 (Witness One stating the workstation "did not have a sleep mode" and "nurses periodically failed to log out"); ¶¶ 82, 86 (Witness Two); ¶ 104 (Witness Three); ¶¶ 108–110 (Witness Four); ¶ 141 (Witness Eight); ¶ 163 (Witness Eleven).  But these additional allegations do not cure the fundamental problem with Relators' earlier pleading: Relators do not allege facts that would establish how these security flaws give rise to a false Meaningful Use Attestation.  Relators have not even plausibly established those deficiencies violate any regulation, let alone a material one.  *Cf.* 45 C.F.R. § 164.310(c) (requiring only that the covered entity "[i]mplement physical safeguards for all workstations that access electronic protected health information, to restrict access to authorized users").  And, as before, the proposed amended pleading contains conflicting allegations on this subject.  Multiple witnesses reported that HCA in fact had policies in place concerning mobile workstation use to ensure patient privacy.  *See, e.g.*, SAC ¶ 71 (failure to log out meant employees "could be subject to discipline"); *id*. ¶ 108 ("employees were required to log off of the computer before walking away from a Meditech workstation"); *id.* ¶ 127

14

("Employees utilizing shared workstations were also required by corporate policy to log out of Meditech whenever they walked away from a workstation.").  Several also stated that HCA provided employees with HIPAA training.  *See, e.g.*, *id.* ¶ 75 ("HCA provided HIPAA training and each HCA hospital employed a compliance officer or privacy officer"); *id.* ¶ 88 ("Witness Two received training from HCA regarding HIPPAA compliance and HCA's own internal policies and procedures."); *id.* ¶ 133 (witness who "provided HIPAA training to hospital staff").

The proposed amended pleading suffers from similar flaws as to other alleged security shortcomings.  As to limitations on access to patient data based on an employee's function, the SAC states that one witness understood just the opposite: "that HCA employees were assigned role-based access."  *Id*. ¶ 135.  Similarly, multiple witnesses reported that there was a way to send encrypted email communications.  *Id.* ¶¶ 130, 136, 154 ("Witness Nine also confirmed that, as per HCA corporate policy, all emails that contained electronic protected health information (ePHI) had to be encrypted.").  And Relators' contention that HCA exhibited "dysfunctional and incomplete audit log functionality" is based solely on Mr. Manley's own medical records.  *Id.* ¶¶ 43, 45.  The experience of one patient at one hospital does not make plausible a system-wide problem that would render an attestation to be false.

Finally, the SAC's new allegations do not support the contention that Defendants failed to conduct the required security risk analyses.  At most, the witnesses and Relators conveyed that they were unaware whether any risk analyses had occurred.  *Id*. ¶¶ 50, 77, 91, 126, 137, 177.  One witness in fact said that "each HCA facility was required to complete an annual security analysis." *Id*. ¶ 153.

The SAC is unquestionably more fulsome than its predecessor.  But Relators' additional evidence does not plausibly establish the requisite elements of falsity, knowledge, and materiality

that the court found lacking in Relators' earlier pleading.  Accordingly, the court denies leave to amend on the grounds of futility.

**V.    CONCLUSION**

For the foregoing reasons, the court grants Defendants' Motion to Dismiss, ECF No. 63, and denies Relators' Motion for Leave to Amend, ECF No. 70.  A final, appealable order accompanies this Memorandum Opinion.

Dated:  June 17, 2025
                                       Amit P. Mehta
                              United States District Judge